UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MARY FRANCES HOPSON AND
BOBBY WAYNE HOPSON                                    PLAINTIFFS


VS.                               CIVIL ACTION NO. 3:12CV505TSL-JMR


CHASE HOME FINANCE LLC;
JP MORGAN CHASE BANK, N.A.;
DEUTSCHE BANK NATIONAL TRUST COMPANY;
CHASE BANK USA, N.A.;
CHASE HOME LENDING;
CHASE MANHATTAN MORTGAGE CORP-CA;
CHASE HOMEOWNERSHIP PRESERVATION;
CHASE FULFILLMENT CENTER;
PROMMIS SOLUTION, LLC ON BEHALF OF
NATIONWIDE TRUSTEE SERVICES, INC.;
THE BANK OF NEW YORK;
J.P. MORGAN MORTGAGE ACQUISITION CORPORATION;
J.P. MORGAN SECURITIES LLC (F/K/A
J.P. MORGAN SECURITIES INC.);
J.P. MORGAN ACCEPTANCE CORPORATION I;
DAVID M. DUZYK; LOUIS SCHIOPPO, JR.;
CHRISTINE E. COLE; EDWIN F. MCMICHAEL;
WILLIAM A. KING; BRIAN BERNARD; JAMES DIMON;
MICHAEL J. CAVANAGH; MARY ERODES, JAMES STALEY          DEFENDANTS


MEMORANDUM OPINION AND ORDER

Plaintiffs Mary Frances Hopson and Bobby Wayne Hopson filed
their original complaint in this cause on July 18, 2012 against JP
Morgan Chase Bank, N.A., Chase Bank USA, N.A. and numerous Chase
affiliates and employees, and against Deutsche Bank National Trust
Company (Deutsche Bank), Prommis Solution, LLC, The Bank of New
York and J.M. Adjustments Services, purporting to assert myriad
claims under state and federal law based on alleged
misrepresentations and nondisclosures in connection with a

mortgage loan that plaintiffs obtained from Chase Bank USA, N.A., in March 2007 for the purchase of a home located in Rankin County, Mississippi.  By order entered November 7, 2012, the magistrate judge granted plaintiffs leave to proceed *in forma pauperis* and directed that plaintiffs file an amended complaint clarifying who they intended to sue and for what reasons.  On November 20, 2012, plaintiffs filed a 122-page amended complaint[1] purporting to more particularly articulate defendants' alleged violations of various federal and state laws relating to plaintiffs' loan transaction.

Upon receipt of service of the amended complaint, defendant JP Morgan Chase Bank promptly moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Additional defendants have joined the motion upon being served with process, including Deutsche Bank, JP Morgan Acquisition Corporation, Chase Home Finance, JP Morgan Securities LLC, Chase Bank USA, N.A., Chase Manhattan Mortgage Corp.-CA and JP Morgan Acceptance Corporation I.[2]  Plaintiffs have responded to the motion and the court, having considered the memoranda of authorities submitted by the parties, concludes for reasons which follow that the motion to

---

[1]    The original complaint was a mere 16 pages.

[2]    Plaintiffs have advised the court by notice filed this week that there are four named defendants on whom they have not served process and against whom they do not wish to proceed, those defendants being The Bank of New York, Michael J. Cavanagh, Mary Erodes and James Staley.

dismiss is well taken and that plaintiffs' complaint should be dismissed in its entirety.

The Complaint

Plaintiff's amended complaint evidently has been cobbled together from several different form complaints that plaintiffs presumably located on the Internet. The "preliminary statement" and "introduction", which purport to recount the history of subprime mortgage lending, appear to have been copied from a form complaint drafted by a California law firm, UFAN Legal Group, and filed in Bhayroo v. Ocwen Loan Servicing, LLC, Case No. RG12616583 (Cal. Super. Ct. May 2, 2012); all of the allegations relating to "Residential Mortgage-Backed Securitizations in General" and causes of action for alleged violations of securities laws (which collectively comprise roughly half of plaintiffs' amended complaint) have been copied nearly verbatim from a complaint filed by the Federal Housing Finance Agency (FHFA), as conservator of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), against JP Morgan Chase, Fed. Housing Fin. Agency v. JP Morgan Chase, et al., No. 1:11-cv-6188-PKC (S.D.N.Y.);[3] and the majority of the

---

[3]     The lawsuit against JP Morgan Chase and various Chase affiliates and employees was one of seventeen lawsuits brought by the Federal Housing Finance Agency (FHFA) against various financial institutions involved in the packaging, marketing and sale of residential mortgage-backed securities that the Fannie Mae and Freddie Mac purchased in the period from 2005 to 2007.  FHFA

remaining allegations appear to have been copied directly from the complaint in <u>Mirales v. Wells Fargo Bank, N.A., et al.</u>, Case No. BC467652 (Super. Ct. Ca. Aug. 16, 2011).[4]  Woven into this amalgamation of assorted pleadings are the following factual allegations pertinent to these particular plaintiffs.

Plaintiffs obtained a $266,000 mortgage loan in March 2007 from Chase Bank USA for the purchase of a home in Rankin County, Mississippi.  During the origination of the loan, plaintiffs dealt with a broker on behalf of Chase Bank who "intentionally failed and/or refused to provide plaintiffs various disclosures that would indicate to plaintiffs that the contract entered into was void and illegal" and "misrepresented the terms of the loan agreement."  That is, while Chase had represented to plaintiffs during the origination of the loan that they would have a thirty-year fixed rate mortgage at 6.9% with monthly payments of

---

asserted claims in all these actions under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, l (a)(2), o; the Virginia Securities Act, VA Code Ann. § 13.1-522(A)(ii), (C); the District of Columbia Securities Act, D.C. Code § 31-5606.05(a)(1)(B), (c); and under the common law for negligent misrepresentation.

[4]    This explains why plaintiffs' complaint includes claims for violations of California, New York, Virginia and District of Columbia statutes.  However, since plaintiffs' loan was not subject to the laws of these other jurisdictions, all of their claims premised on foreign laws are due to be dismissed.  <u>See</u> <u>Fitzgerald v. McKee</u>, 153 Miss. 198, 121 So. 127, 129 (Miss. 1929) (stating that "the validity of a mortgage and its construction and effect are to be tested and determined by the laws of the state where the mortgaged property is situated").

4

approximately $1,200, the terms of the loan presented to
plaintiffs at closing were much different, namely, a two-year
adjustable rate mortgage at 8.75% with monthly payments of $2,116.
When plaintiffs questioned this, the broker assured them the loan
would be affordable and that they could adjust easily by
refinancing in two years to get a lower rate and payment before
the rate adjusted upward.  Plaintiffs signed the loan documents –
including three HUD-1 Settlement Statements, each with different
figures – because they were told this was "standard practice" and
they "felt pressured" to do so "due to the many closing documents
being passed around, the fast talk and the private conference with
Chase."  However, at the closing, they were not provided copies of
the documents they signed; and while they were assured they would
receive a signed copy of the completed loan package in the mail,
the documents were never provided.

Plaintiffs allege that after the economic crisis severely and
unforeseeably altered their financial circumstances and their
adjustable rate payments continued to increase, they sought a loan
modification from Chase, which continued to service their loan
despite the loan having been sold to Deutsche Bank following the
closing.  After enlisting the assistance of an attorney group and
following an extensive battle with Chase and many threatened
foreclosures, Chase offered plaintiffs a trial modification and
represented to them that they would receive documents for a

permanent modification after making their third trial payment.
However, despite making six consecutive timely monthly payments,
plaintiffs received notice from Chase that their request for
modification was denied since their paperwork was not timely
received.  Their efforts to rectify the problem were rejected, and
defendants have continued to demand payment and to threaten to
foreclose on plaintiffs.  Plaintiffs allege that as a result of
these events, they have suffered extreme emotional distress; their
credit has been negatively impacted, which has in turn negatively
impacted their business and income; and they have lost the equity
in their home.  They seek as relief, *inter alia*, damages of not
less than $2,168,715.60 per defendant, restitution, rescission and
vacatur of the note and deed of trust.

Scattered throughout plaintiffs' amended complaint are
references to various federal and state laws which they contend
were violated.  From what the court can reasonably discern,
plaintiffs have attempted to allege claims for violation of the
following federal laws:  the Securities Act of 1933, 15 U.S.C.
§ 77a *et seq.*; the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*,
and Regulation Z promulgated thereunder, 12 C.F.R. § 226; the Real
Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*; the
Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*; the
Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*; the Home
Ownership and Equity Protection Act, 15 U.S.C. § 1639; the

Troubled Asset Relief Program, 12 U.S.C. § 5211 *et seq.*; Title III of the USA Patriot Act, 31 U.S.C. § 5318 *et seq.*; and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*  In addition, they have alleged state common law claims for wrongful foreclosure, fraudulent misrepresentation and/or negligent misrepresentation, aiding and abetting, promissory estoppel and cancellation of instruments.  Defendants have moved for dismissal of each of plaintiffs' purported causes of action on one or more bases.  Plaintiffs oppose the motion, and insist that they have "sufficiently pled that relief can be granted on each and every one of the complaint's causes of action."[5]  The court addresses each of these claims below.

_____

[5]     Despite this broad declaration, plaintiffs' response and response memorandum make no reference to a number of their purported claims, including the claims for RICO violations, wrongful foreclosure, breach of contract, aiding and abetting, cancellation of instruments and promissory estoppel.  Thus, the court will address these claims without benefit of a response.
     While plaintiffs have failed to address a number of claims that do appear in the amended complaint, plaintiffs' response argues against dismissal of claims that do not appear in their complaint.  For instance, plaintiffs argue that their complaint "states a claim ... under 42 U.S.C. § 1983 [as to which] they have standing because Defendants [sic] (conduct) threatens ... denial of plaintiffs' constitutional rights."  There is no hint of a § 1983 claim in the amended complaint nor any basis for such a claim.
     Plaintiffs further argue in support of a claim included in their original complaint but dropped in their amended complaint, based on tender and payment.  In their original complaint, plaintiffs alleged that they had satisfied the loan by offering to "tender full payment to be held in escrow by Gayle L. Sullivan a third party Notary Public" if Chase would "immediately produce the original unaltered (wet ink signature) note which it claims to be

Rule 12(b)(6) Standard of Review

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The pleading standards for a Rule 12(b)(6) motion to dismiss are derived from Rule 8 of the Federal Rules of Civil Procedure, which provides, in relevant part, that a pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  In re McCoy, 666 F.3d 924, 926 (5th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).  "The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when all well-pleaded facts are assumed true and are viewed in the light most favorable to the plaintiff."  Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010) (citing In re Katrina Canal Breaches Litig., 495 F.3d 191, 205

---

holding...."  No such claim was included in the amended pleading; and as defendants note in their rebuttal, "[a]n amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading."  King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994).  The claim would fail in any event.  See Frank v. Wells Fargo Bank Nat. Ass'n, No. CV-11-08035-PCT-NVW, 2011 WL 1480041, 4 (D. Ariz. Apr. 19, 2011) (stating that "Plaintiff's allegations regarding funds purportedly tendered by Gayle Sullivan fail to explain how acceptance of these funds would have satisfied her loan obligation," and further observing "with respect to the allegation that Defendants are required to produce the original promissory note," that "this 'show me the note' theory has been repeatedly rejected ....") (citations omitted).

(5th Cir. 2007)).  To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." <u>Id</u>. (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  While "'detailed factual allegations' are not necessary, the pleading must be supported by more than mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action." <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citation omitted).

In construing complaints by plaintiffs proceeding *pro se*, the court applies a "less stringent standard" than used when examining complaints filed by counsel.  <u>Frazier v. Wells Fargo Bank, N.A.</u>, 541 Fed. App'x 419, 421 (5th Cir. 2013) (citing <u>Taylor v. Books A Million, Inc.</u>, 296 F.3d 376, 378 (5th Cir. 2002)).  "Nonetheless, *pro se* litigants, like all other parties, 'must abide by' the rules that govern the federal courts, <u>id</u>. (citing <u>United States v. Wilkes</u>, 20 F.3d 651, 653 (5th Cir. 1994)), and "'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss,'" <u>Taylor</u>, 296 F.3d at 378 (<u>Christian Leadership Conference v.</u>

Supreme Court of the State of La., 252 F.3d 781, 786 (5th Cir. 2001)).

Securities Violations

More than half of the purported "factual allegations" in plaintiffs' amended complaint are taken directly from the complaint in Federal Home Finance Agency v. JP Morgan Chase, et al., No. 1:11-cv-6188-PKC, and relate to Chase's securitization practices that allegedly contributed to the 2008 financial crisis. More particularly, the allegations undertake to chronicle Chase's alleged negligent and fraudulent conduct in the sale of residential mortgage-backed securities.[6]  Plaintiffs allege that

---

[6]     The court in Federal Housing Finance Agency v. UBS Americas, Inc., offered the following summary of a similar complaint brought by FHFA against USB:

> Plaintiff contends that Fannie Mae and Freddie Mac purchased over $6.4 billion in residential mortgage-backed securities ("RMBS") sponsored or underwritten by UBS entities during the period between September 2005 and August 2007.  RMBS are securities entitling the holder to income payments from pools of residential mortgage loans that are held by a trust.  For each of the securities at issue here, the offering process began with a "sponsor," which acquired or originated the mortgage loans that were to be included in the offering.  The sponsor transferred a portfolio of loans to a trust that was created specifically for that securitization; this task was accomplished through the involvement of an intermediary known as a "depositor."  The trust then issued Certificates to an underwriter, in this case UBS Securities, which in turn, sold them to the GSEs (Fannie Mae and Freddie Mac).  The Certificates were backed by the underlying mortgages.  Thus, their value depended on the ability of mortgagors to repay the loan principal

10

defendants[7] are liable "for making false and materially misleading

> and interest and the adequacy of the collateral in the
> event of default.
>
> Each of the Certificates implicated in this case was
> issued pursuant to one of seven Shelf Registration
> Statements filed with the Securities and Exchange
> Commission ("SEC").  Each individual defendant signed
> one or more of the two Shelf Registration Statements
> that pertained to the securitizations for which MASTR
> acted as depositor.  The Registration Statement,
> together with the relevant prospectus and prospectus
> supplement constitute the "offering documents" for each
> security.
>
> Generally, FHFA asserts that the offering documents for
> the twenty-two securitizations identified in the
> complaint "contained materially false statements and
> omissions."  More particularly, the SAC alleges that
> "[d]efendants falsely represented that the underlying
> mortgage loans complied with certain underwriting
> guidelines and standards, including representations that
> significantly overstated the borrowers' capacity to
> repay their mortgage loans."  The offering documents are
> also alleged to have contained representations regarding
> "the percentage of loans secured by owner-occupied
> properties and the percentage of the loan group's
> aggregate principal balance with loan-to-value ratios
> within specified ranges" that were both false and
> materially incomplete.  Plaintiff asserts that "the
> false statements of material facts and omissions of
> material facts in the Registration Statements, including
> the Prospectuses and Prospectus Supplements, directly
> caused Fannie Mae and Freddie Mac to suffer billions of
> dollars in damages," because "[t]he mortgage loans
> underlying the GSE Certificates experienced defaults and
> delinquencies at a much higher rate than they would have
> had the loan originators adhered to the underwriting
> guidelines set forth in the Registration Statement."

Federal Housing Finance Agency v. UBS Americas, Inc., 858 F. Supp.
2d 306, 312-13 (S.D.N.Y. 2012).  Identical allegations are made in
plaintiffs' complaint herein.

[7]    It should be noted that for the most part, plaintiffs do
not differentiate between the various Chase defendants and in most
cases, do not specify which claims are asserted against which

misstatements in [each] of [their] Registration Statements, and for omitting facts necessary to make the facts stated therein not misleading[,]" all in violation of § 11 of the Securities Act of 1933, 15 U.S.C. § 77k.  Plaintiffs similarly undertake to state a claim for violation of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), based on allegations that defendants "made materially false and misleading statements in the Prospectuses for the Securitizations carried out under the Registration Statements they filed...."  Plaintiffs further allege that certain defendants have controlling-person liability under § 15 of the Securities Act of 1933 for the violations of § 11 and § 12(a)(2), and for the violation of 18 U.S.C. § 1962.  Plaintiffs lack standing to assert any of these claims.

The Securities Act of 1933 "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194-195, 96 S. Ct. 1375, 1381-1382 (1976).  Section 11 of the Act states:

> In case any part of the registration statement, when
> such part became effective, contained an untrue
> statement of a material fact or omitted to state a
> material fact required to be stated therein or necessary

---

defendant or defendants.

12

> to make the statements therein not misleading, *any*
> *person acquiring such security* (unless it is proved that
> at the time of such acquisition he knew of such untruth
> or omission) may, either at law or in equity, in any
> court of competent jurisdiction, sue ....

15 U.S.C. § 77k (emphasis added).  By its clear terms, "an action

under § 11 may be maintained only by one who comes within a narrow

class of persons, i.e. those who purchase securities that are the

direct subject of the prospectus and registration statement."

Barnes v. Osofsky, 373 F.2d 269, 273 (2d Cir. 1967); see also Krim

v. pcOrder.com, Inc., 402 F.3d 489, 491-92 (5th Cir. 2005)

(explaining that "Section 11 provides a right of action to 'any

person acquiring' shares issued pursuant to an untrue registration

statement."); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d

326, 369 (S.D.N.Y. 2011) (stating that "Section 11 expressly

limits recovery to 'any person acquiring such security'"); New

Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08

Civ 5653(PAC), 2010 WL 1473288, 3 (S.D.N.Y. Mar. 29, 2010)

(holding that plaintiff asserting § 11 claims concerning

mortgage-backed securities from issuing trust lacked standing to

sue on claims arising from trust offerings which he did not

purchase).  Plaintiffs do not allege that they are investors or

that they purchased securities, directly or indirectly.  This

claim will therefore be dismissed.

As with § 11, suit may be brought under § 12(a)(2) only by a

purchaser of the security.  That is, this section provides that

any person who offers or sells a security through a prospectus or
an oral communication containing a material misstatement or
omission, is liable to the purchaser for rescission of the
purchase or damages, provided that the purchaser did not know
about the misstatement or omission at the time of the purchase.
See 15 U.S.C. § 77l(a)(2) (providing that seller "shall be liable
... *to the person purchasing such security from him....*")
(emphasis added); see also In re Wachovia Equity Sec. Litig., 753
F. Supp. 2d at 369 ("The text of Sections 11 and 12(a)(2) also
precludes ... Plaintiffs from bringing claims for losses in
securities they never purchased or acquired.").

Plaintiffs further allege controlling-person liability under
§ 15.  However, since plaintiffs lack standing to pursue their
§ 11 and 12(a)(2) claims, their § 15 claim fails as a matter of
law.  See In re Exodus Communications, Inc. Securities Litigation,
No. C-01-2661 MMC, 2006 WL 1530081, at *2 n.2 (N.D. Cal. June 2,
2006) (explaining that § 15 claim is derivative of § 11 claim so
that if the plaintiff "lacks standing to assert a § 11 claim, he
likewise lacks standing to assert his § 15 claim"); Jasin v.
Kozlowski, Civ. Action No. 1:04-cv-2188, 2010 WL 4536973, at *10
(M.D. Pa. Nov. 3, 2010) (holding that plaintiff who does not have
standing to pursue claims under section 11 and 12(a)(2) cannot
proceed under section 15).

Truth-in-Lending Act/Home Ownership and Equity Protection Act

14

In their amended complaint, plaintiffs allege that defendants
failed to provide disclosures required by the Truth-in-Lending Act
(TILA) and Home Ownership and Equity Protection Act (HOEPA),
though they did not specify what defendants failed to disclose.
In their motion, defendants assert, among other reasons, that
plaintiffs' claims for damages and rescission with respect to the
alleged violations of TILA and HOEPA should be dismissed since it
is apparent from the face of the complaint that these claims are
time barred.  Defendants are correct.

TILA was enacted as part of the Consumer Credit Protection
Act of 1968 "to assure a meaningful disclosure of credit terms so
that the consumer will be able to compare more readily the various
credit terms available to him and avoid the uninformed use of
credit, and to protect the consumer against inaccurate and unfair
credit billing ... practices."  15 U.S.C. § 1601(a).  "Both TILA
and Regulation Z, promulgated by the Federal Reserve Board to
implement TILA, require creditors in mortgage lending transactions
to give numerous disclosures to the borrower, including the amount
financed, the finance charge, the total sale price, and
information regarding debt cancellation."  <u>Fantroy v. First Fin.
Bank, N.A.</u>, No. 3:12-CV-82-N-BH, 2013 WL 4434913, at *5-6 (N.D.
Tex. Aug. 19, 2013) (citing 15 U.S.C. §§ 1638(a), 1639(a); 12
C.F.R. §§ 226.1(a), 226.17-18).  In addition, for mortgage lending
transactions that involve a lien on the borrower's principal

dwelling, TILA requires that the creditor provide the borrower with written "good faith estimates" of the required disclosures at least seven business days before the transaction is consummated. 15 U.S.C. § 1638(b)(2)(A).  Moreover, in such transactions, the creditor must fully disclose to the borrower that he has right to rescind the "transaction until midnight of the third business day following [its] consummation," Fantroy, 2013 WL 4434913, at *6 (quoting 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)), and it must provide the borrower with the necessary forms to enable him to exercise that right, id. (citing id. § 1635(a); 12 C.F.R. § 226.23(b)).  HOEPA augments TILA by imposing additional disclosure obligations for lenders who issue certain "high-cost" mortgage loans.  See Renfrow v. CTX Mortgage Co., LLC, No. 3:11–CV–3132–L, 2012 WL 3582752, at *5 (N.D. Tex. Aug. 20, 2012).

TILA and HOEPA grant borrowers a private cause of action to ensure proper disclosure by creditors and remedy nondisclosure violations.  Fantroy v. First Fin. Bank, N.A., Civ. Action No. 3:12–CV–0082–N (BH), 2012 WL 6764551, at *4 (citing 15 U.S.C. § 1640(a)).  A claim seeking rescission is subject to a three-year statute of limitation established by § 1635(f), which runs from the date on which the transaction was consummated.  See Lowery v. Capital One Mortg., 429 Fed. App'x 377, 378 (5th Cir. 2011) ("the right to rescission under the TILA expires after three years"); Taylor v. Domestic Remodeling, Inc., 97 F.3d 96, 98 (5th Cir. 1996)

("the consumer's right of rescission extends for three years after the date of consummation of the transaction"). This statute of limitations "mirrors a typical statute of repose in that it absolutely bars rescission claims filed more than three years after the loan transaction is consummated." Fantroy, 2012 WL 6764551, at *3 (citing Renfrow, 2012 WL 3582752, at *5; § 1635(f); Beach v. Ocwen Fed. Bank, 523 U.S. 410, 419, 118 S. Ct. 1408, 140 L. Ed. 2d 566 (1998)). See also Lowery, 429 Fed. App'x at 378 (explaining that the Supreme Court concluded in Ocwen that "§ 1635(f) does not contain a statute of limitations for bringing a claim, but rather provides that the right to rescission under the TILA expires after three years"). Plaintiffs' filed their complaint in this cause on July 18, 2012, well over three years past the date on which the subject loan transaction was consummated. Their claim for rescission is thus time barred.

A TILA damages claim for nondisclosure is subject to a one-year statute of limitations, which runs from the date on which the transaction is consummated. See 15 U.S.C. § 1640(e) (action for TILA violation must proceed "within one year from the date of the occurrence of the violation"); Fantroy, 2013 WL 4434913, at *5 ("'Concluding a credit transaction without giving the required disclosures constitutes a TILA nondisclosure violation,' which occurs when the transaction is 'consummated.'") (quoting Moor v. Travelers Ins. Co., 784 F.2d 632, 633 (5th Cir. 1986)). As

plaintiffs' loan was finalized more than a year prior to the filing of this action, their TILA damages claim is also time-barred.

Plaintiffs also allege that § 1641(g)(1) was violated.  That provision of TILA provides that "not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer."  15 U.S.C. § 1641(g)(1).  Defendants contend, and the court agrees, that this provision is inapplicable to the transfer of plaintiffs' mortgage loan to Deutsche Bank since the transfer occurred on February 4, 2008, prior to the May 20, 2009 effective date of § 1641(g).  In any event, the statute of limitations for a claim for damages based on a violation of 15 U.S.C. § 1641(g) is one year after the occurrence of the violation.  See Kilpatrick v. U.S. Bank, NA, No. 12-cv-1740-W(NLS), 2014 WL 1247336, at *3 (S.D. Cal. Mar. 24, 2014).  Since the transfer occurred more than three years prior to the date on which suit was filed and plaintiffs have identified no basis for equitable tolling, this claim is untimely and will be dismissed.

Real Estate Settlement Procedures Act

Plaintiffs allege that Chase Home Finance violated § 2605(e) of the Real Estate Settlement Procedures Act (RESPA) by failing to make a proper response to their "qualified written request" sent

18

pursuant to § 2605(e) of RESPA, "demand[ing] ... audits of the entire account" and "seeking to learn the identity of potential Mortgage Backed Securities Investors who might own their Note." "To state a viable claim under Section 2605(e), the [plaintiffs] had to plead that their correspondence met the requirements of a QWR, that [Chase] failed to make a timely response, and that this failure caused them actual damages." Williams v. Wells Fargo Bank, N.A., – Fed. App'x –, 2014 WL 1044304, at *7 (5th Cir. Mar. 19, 2014) (citing 12 U.S.C. § 2605(e), (f)).

RESPA requires the servicer of a federally related mortgage loan to provide a timely written response to a "qualified written request" from a borrower.  The statute defines a "qualified written request" as

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
>
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).  Under § 2605(e)(1)(A), a servicer must respond to such a letter if it requests or challenges "information relating to the servicing of such loan."  Id. § 2605(e)(1)(A), (e)(2).  If the servicer fails to respond properly to such a

request, the statute entitles the borrower to recover actual

damages and, if there is a "pattern or practice of noncompliance,"

statutory damages of up to $1,000.  Id. § 2605(f)

 Defendants contend that no relief is available to plaintiffs

under RESPA because the information which plaintiffs allege they

sought from Chase Home Finance did not "relat[e] to the servicing

of [their] loan" and thus was not a "qualified written request"

(QWR) within the meaning of RESPA.  The document that plaintiffs

allege constituted the QWR that forms the basis for their RESPA

claim appears similar to that described by the court in Watts v.

Federal Home Loan Mortgage Corporation, Civ. No. 12-692 (SRN/JSM),

2012 WL 6928124, at *5 (D. Minn. Oct. 30, 2012), which the court

concluded was not a QWR.  The court in Watts stated:

> Nowhere in the document does Watts provide a statement
> explaining his belief that the account is in error.
> Rather, the correspondence posed rambling, repetitive,
> discovery-style document demands and interrogatories,
> including his demand that Wells Fargo produce "the
> original uncertificated or certificated security ...
> [i]n the event you do not supply me with the very
> security, it will be a positive confirmation on your
> part that you never really created or owned one."

2012 WL 6928124, at *10.  This precisely describes plaintiffs'

letter to Chase Home Finance, which contains identical language.

The court in Watts continued, stating,

> A clue to what Watts thought he was doing by sending
> Wells Fargo this correspondence is found on page two of
> the letter, which stated that Watts has authorized an
> audit of his mortgage by unnamed "mortgage auditing and
> predatory servicing or lending experts."  Watts claimed

20

to need answers to the ensuing 191 questions to
facilitate the "audit."  It appeared highly unlikely to
this Court that Watts, a *pro se* party, drafted the 191
questions.  It seemed more likely that he compiled the
questions based on various such requests (which also
purport to be QWRs) circulating on the Internet.  <u>See</u>,
<u>eg.</u> http://www.scribd.com/doc/91 551485/ Killer-QWR-
Qualified-Written-Request (twenty-page "killer" "QWR"
posing many of the same questions found in Watts "QWR");
http://www.loansafe.org/forum/unite-fight-share-your-
ideas-how-homeowners-can-fight-back-against-fraud/
14574-mother-of-all-qwrs-guaranteed-make-em-squirm-sweat
-bucket.html (purported "QWR" posing many of the same
questions as Watts' "QWR" and stating that "default
provisions exist under this Qualified Written Request,"
as did Watts' "QWR").

<u>Id</u>. at *11.  Plaintiffs' putative QWR in the case at bar likewise

recites that plaintiffs had authorized a thorough examination,

accounting and audit of their mortgage by unnamed "mortgage

auditing and predatory servicing or lending experts," and further

states that the answers to 192 questions are needed to "conduct

the examination and audit."

     As in <u>Watts</u>, the plaintiffs' ostensible QWR did not allege

any error relating to their loan or seek any information relating

to its servicing.  Rather, it principally demanded information to

facilitate an "audit" of plaintiffs' account so that their

analysts could evaluate the validity of the debt and determine the

identity of the owner of plaintiffs' note.  Their inquiries aimed

at securing such information does not qualify as a request for

information relating to the servicing of their loan.  <u>See</u> <u>Watts</u>,

2012 WL 6928124, at *10 ("'Requests for information pertaining to

the identity of a note holder or master servicer do not relate to servicing' and are not QWRs.") (quoting <u>Kelly v. Fairon & Associates</u>, 842 F. Supp. 2d 1157, 1157 (D. Minn. 2012)); <u>Radford v. JPMorgan Chase Bank, N.A.</u>, Civil No. 10-2942 (JRT/JSM), 2012 WL 3835847, at *5 (D. Minn. June 7, 2012) ("Requests for information pertaining to the identity of a note holder or mortgage holder do not relate to servicing the loan and thus failure to provide such information is not a violation of RESPA.").

Given the breadth of plaintiffs' putative QWR, it is possible that one or more of their 192 requests for information may have touched on Chase's servicing practices; but in the court's opinion, it cannot fairly be said that the letter sought information relating to the servicing of plaintiffs' loan. Certainly, plaintiffs did not make a sufficiently clear request for information relating to the servicing of their loan to require a response by Chase.  <u>See</u> <u>Watts</u>, 2012 WL 6928124, at *10 ("'A request for information need not be answered under RESPA if it does not "provide[ ] sufficient detail to the servicer regarding ... information sought by the borrower"'") (quoting <u>Devary v. Countrywide Home Loans Inc.</u>, 701 F. Supp. 2d 1096, 1107 (D. Minn. 2010), in turn quoting 12 U.S.C. § 2605(e)(1)(B)(ii)).

Even if the letter were considered a QWR, plaintiffs' claim would nevertheless fail as plaintiffs do not allege they suffered any actual damages as a result of Chase's failure to respond to

their supposed QWR.  RESPA allows for damages relating to QWRs in

"an amount equal to the sum of — (A) any actual damages to the

borrower as a result of the failure; and (B) any additional

damages, as the court may allow, in the case of a pattern or

practice of noncompliance with the requirements of this section,

in an amount not to exceed $1,000." 12 U.S.C. § 2605(f)(1).  In

order to state a claim for a violation of § 2605, a plaintiff must

allege that the breach resulted in actual damages.  See Williams,

2014 WL 1044304, at *7 (citing 12 U.S.C. § 2605(e), (f)).  While

courts "have interpreted this requirement liberally ... the loss

alleged must be related to the RESPA violation itself." Hensley

v. Bank of New York Mellon, No. 1:10-CV-1316 AWI SMS, 2011 WL

4084253, at *3-4  (E.D. Cal. 2011) (internal quotation marks and

citations omitted).  See also Watts, 2012 WL 6928124, at *11

(dismissing RESPA claim since "[e]ven if Watts' correspondence was

a QWR, which it was not, Watts failed to allege actual damages.");

Jones v. Vericrest Fin., Inc., Civ. Action No.

1:11-CV-2330-TWT-CCH, 2011 WL 7025915, at *19 (N.D. Ga. Dec. 7,

2011) (finding that even if the plaintiff had sufficiently alleged

that the defendant violated RESPA by failing to adequately respond

to a QWR, RESPA claim would still be dismissed since "the

Plaintiff has not included any factual allegations explaining how

Flagstar's failure to provide an adequate response to the QWR

caused her to suffer any damages"); Yates v. GMAC Mortg. LLC, Civ.

23

Action No. 1:10-cv-2546-RWS, 2010 WL 5316550 at *4 (N.D. Ga.
Dec.17, 2010) (dismissing RESPA claim with prejudice because
plaintiff failed to "articulate any facts showing how Defendant's
failure to respond or inadequate response to the RESPA requests
resulted in any damages or the amount of such damages"); Phillips
v. Bank of America Corp., No. 10-cv04561EJD, 2011 WL 4844274 at *5
(N.D. Cal. Oct.11, 2011) (dismissing plaintiff's RESPA claim
because plaintiff failed to allege facts showing "that it is
plausible, rather than merely possible" that the claimed damages
resulted from defendant's alleged violation of RESPA).

Here, plaintiffs do not specify in the complaint any damages
that were suffered as a result of Chase's alleged failure to
adequately respond to plaintiffs' alleged QWR.  Plaintiffs allege
generally that they have sustained a reduction in property value,
harm to their credit scores, the threat of foreclosure and mental
and emotional distress damages.  Yet there is nothing in the
complaint to link any of these alleged damages to Chase's alleged
violation of RESPA.  See Durland v. Fieldstone Mortgage Co., No.
10CV125, 2011 WL 805924, at *3 (S.D. Cal. Mar. 1, 2011) (mere
allegations of damages, including fees assessed, negative credit
reporting, and emotional distress, were insufficient to establish
a causal link between the alleged RESPA violations and plaintiff's
claimed damages); Lawther v. Onewest Bank, No. C 10-0054RS, 2010
WL 4936797 at *7 (N.D. Cal. Nov.30, 2010) (dismissing plaintiff's

RESPA claim because it "remain[ed] unexplained ... how the QWR failure itself is causally connected to the claimed distress of [plaintiff] or his family").

   Fair Debt Collection Practices Act

   Plaintiffs allege that defendants violated the Fair Debt Collection Practices Act (FDCPA) by using "false representation[s] and deceptive means" and "unfair and unconscionable means" to collect or attempt to collect the allege[d] debt from the Plaintiffs", attempting to collect the debt in a manner not authorized by the mortgage and note, and threatening to unlawfully repossess the property.  The FDCPA imposes civil liability on "debt collector[s]" for certain prohibited debt collection practices.  Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 573, 130 S. Ct. 1605, 176 L. Ed. 2d 519 (2010) (citing 15 U.S.C. § 1692 et seq.).  A debt collector who "fails to comply with any [FDCPA] provision ... with respect to any person is liable to such person" for "actual damage[s]," costs, "a reasonable attorney's fee as determined by the court," and statutory "additional damages."  Id. (quoting § 1692k(a)).  The FDCPA applies only to "debt collectors", which it defines as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to

collect, directly or indirectly, debts owed or due or asserted to be owed or due another". 15 U.S.C. § 1692a(6).

In the case at bar, plaintiffs have failed to allege facts sufficient to state a FDCPA claim as they have not alleged any facts to indicate that any of the named defendants is a "debt collector" as defined by the FDCPA.  "Mortgage lenders and mortgage servicing companies are not 'debt collectors' within the meaning of the FDCPA." Gipson v. JP Morgan Chase, Civil Action No. 3:13–CV–2477–L, 2014 WL 947923, at *2 (N.D. Tex. Mar. 11, 2014); Montgomery v. Wells Fargo Bank, N.A., 459 F. App'x 424, 428 n.1 (5th Cir. 2012)(holding that plaintiff's "FDCPA claim fails because mortgage lenders are not 'debt collectors' within the meaning of the FDCPA."); Perry v. Stewart Title Co., 756 F.2d 1197, 1208 (5th Cir. 1985) (holding that "a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned").  Accordingly, this claim will be dismissed.

Fair Credit Reporting Act

Plaintiffs allege that defendants made "false credit disclosures to third parties" and thereby violated the Fair Credit Reporting Act (FCRA).  Defendants submit that dismissal is in order because plaintiffs have no standing under and have not stated a plausible FCRA claim.  "'The FCRA was the product of

26

Congressional concern over abuses in the credit reporting industry.'  The legislative history of the FCRA reveals that it was crafted to 'protect an individual from inaccurate or arbitrary information in a consumer report.'"  Bachman v. Donahoe, 460 Fed. App'x 383, 385 (5th Cir. 2012) (quoting St. Paul Guardian Ins. Co. v. Johnson, 884 F.2d 881, 883 (5th Cir. 1989) (internal quotations and alterations omitted).  Under U.S.C. § 1681s-2(a), "furnishers" of information that transmit information to a credit reporting agency concerning a debt owed by a consumer have a duty to provide accurate information, see id. ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate."); "but § 1681s-2(d) grants the FTC exclusive enforcement power over ... subsection 1681s-2(a)," Olexy v. Interstate Assurance Co., 113 F. Supp. 2d 1045, 1047 (S.D. Miss. 2000) (citing Washington v. CSC Credit Servs., Inc., 199 F.3d 263, 269 n.5 (5th Cir. 2000)); see also § 1681s-2(d) ("Subsection (a) of this section shall be enforced exclusively under section § 1681s of this title by the Federal agencies and officials and the State officials identified in that section.").  Thus, to the extent they may contend that § 1681s-2(a) was violated, plaintiffs have no private right of action.

"Section 1681s-2(b) imposes duties on furnishers of information to, *inter alia*, investigate disputed information and

report the results of any such investigation to the consumer reporting agency." Young v. Equifax Credit Information Services, Inc., 294 F.3d 631, 639 (5th Cir. 2002).  It is an open question in the Fifth Circuit whether a violation of this provision gives rise to a private right of action.  See id. (finding it unnecessary to decide issue).  However, this duty to investigate arises only after proper notice from a credit reporting agency of a dispute by the consumer under § 1681i(a)(2).  See id.  Thus, "[t]o state a claim under § 1681s-2(b), a consumer must allege facts demonstrating that the requisite notice was given." Allmond v. Bank of America, No. 3:07-cv-186-J-33JRK, 2008 WL 205320, at *7 (M.D. Fla. Jan. 23, 2008).  Plaintiffs do not allege that Chase was ever provided with notice of a dispute they filed with a consumer reporting agency and accordingly they have not stated a cognizable FCRA claim.[8]

---

[8]    Plaintiffs' putative FCRA claim is not based on Chase's having provided inaccurate information to a credit reporting agency or having failed to investigate after notice from a credit reporting agency of a disputed debt.  Rather, plaintiffs' claim is that Chase, relative to the securitization involving plaintiffs' loan, misrepresented to potential investors, i.e., purchasers of bundled mortgage pools created by Chase, that plaintiffs' and the other borrowers' credit was adequate to support continued loan payments when Chase, in fact, knew that their credit was insufficient to support such payments.  Plaintiffs allege that "[t]hese pervasive false credit disclosures to third parties ... constituted false credit reports in violation of the Fair Credit Reporting Act...."  As defendants correctly note, the FCRA does not apply to any alleged "credit disclosures" to potential investors in connection with the securitization of plaintiffs' loan.

<u>Troubled Asset Relief Program</u>

"In response to the financial crisis Congress enacted the Emergency Economic Stabilization Act of 2008, which in turn authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program ("TARP")."   <u>Thomas v. JPMorgan Chase & Co.</u>, 811 F. Supp. 2d 781, 786 (S.D.N.Y. 2011) (citing 12 U.S.C. §§ 5201–5261).   "TARP directed the Secretary of the Treasury to 'implement a plan that seeks to maximize assistance for homeowners' and allowed the Secretary to 'use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures.'"   <u>Id</u>. at 786-87 (quoting 12 U.S.C. § 5219(a)(1)).   "Under this authority, the Department of the Treasury announced the 'Making Home Affordable Program' in February 2009, which included the 'Home Affordable Mortgage Program' ('HAMP').   HAMP was aimed at helping homeowners who were in, or were at immediate risk of being in, default on their home loans by reducing monthly payments to sustainable levels."   <u>Id</u>. at 787.

Plaintiffs herein have undertaken to assert a claim against defendants for breach of contract based on the theory that they are intended third-party beneficiaries of contracts between defendants and the United States Government pursuant to which defendants received federal funds under TARP.   Plaintiffs allege that defendants' acceptance of federal funds pursuant to TARP

"created an obligation to modify loans outstanding on Plaintiffs' real estate" and to otherwise use TARP funds for the benefit of borrowers, such as plaintiffs, and that as a result of their failures in this regard, defendants are liable to plaintiffs for breach of contract.

Courts to consider the issue have consistently held that TARP does not authorize plaintiff mortgagors to bring a private action against TARP fund recipients. See, e.g., Mik v. Federal Home Loan Mortg. Corp., 743 F.3d 149, 160 (6th Cir. 2014) (finding that TARP provides no private right of action against individuals or non-governmental entities who violate TARP's provisions; Thomas v. Pentagon Federal Credit Union, 393 Fed. App'x 635, 638 (11th Cir. 2010) (reasoning that as TARP "provides for judicial review of the Secretary's decision, but does not mention a private right of action against private entities ... it appears that Congress did not intend to allow such actions under § 5211") (citing 12 U.S.C. § 5211(a)(1)); Brecker v. 1st Republic Mortg. Bankers, Inc., Civil Action No. 13-5646, 2013 WL 5729783, at *2 (D.N.J. Oct. 21, 2013) (observing that "courts across the country have held that TARP does not contain such a private cause of action" and citing cases from Arizona, California, Delaware, Florida and Georgia) (citations omitted). Courts likewise have held that mortgagors are not third-party beneficiaries of lenders' contractual agreements with the government for the receipt of TARP funds.

30

See, e.g., <u>Guthrie v. Bank of America, Nat. Ass'n</u>, Civil No. 12-2472 ADM/LIB, 2012 WL 6552763, at *4 (D. Minn. Dec. 14, 2012) (holding that "[p]laintiffs were not intended third-party beneficiaries of the TARP agreement between the government and Bank of America, as that governmental contract was intended to benefit the public at large, not Plaintiffs or any other individual party."); <u>Yongbae Kim v. Bank of America, N.A.</u>, No. C11-296 MJP, 2011 WL 3563325, at *4 (W.D. Wash. Aug. 11, 2011) (finding that "[a]lthough Plaintiffs may be incidental beneficiaries, they are not intended beneficiaries of the Defendants' contract with the Treasury Department."); <u>Thomas v. JPMorgan Chase & Co.</u>, 811 F. Supp. 2d 781, 798 (S.D.N.Y. 2011) (finding that "plaintiffs were neither parties to the [Service Participation Agreement between Chase and U.S. Treasury Department] nor intended third-party beneficiaries of that agreement" and as such could not enforce any covenant of that agreement, express or implied"); <u>Warner v. Wells Fargo Bank, N.A.</u>, No. SACV 11-00480 DOC (PLAx), 2011 WL 2470923, at *3 (C.D. Cal. June 21, 2011) (holding that plaintiffs could not proceed on third-party beneficiary theory to enforce obligations under TARP since "this kind of third party beneficiary theory is 'incompatible with the statutory regime.'") (quoting <u>Astra USA, Inc. v. Santa Clara Cnty.</u>, ––– U.S. –––– , 131 S. Ct. 1342, 179 L. Ed. 2d 457, 2011 WL 1119021 (2011)).   Consequently, plaintiffs

cannot state a plausible claim for relief against any defendant for breach of contract or under TARP.

Racketeer Influenced and Corrupt Organizations Act

Plaintiffs' complaint recites that plaintiffs are bringing a claim pursuant to 18 U.S.C. § 1962, under the Racketeer Influenced and Corrupt Organizations Act (RICO). However, plaintiffs have utterly failed to allege a basis for any such claim. "Under the civil RICO statute, '[a]ny person injured in his business or property by reason of a violation of section 1962' can sue for treble damages and fees.'" Welborn v. Bank of New York Mellon Corp., – Fed. App'x –, 2014 WL 843262, at *1 (5th Cir. Mar. 5, 2014) (citing 18 U.S.C. § 1964(c)". "[A] claim requires three elements: (1) a RICO violation under 18 U.S.C. § 1962; (2) an injury to any person's business or property; and (3) the injury must be "by reason of" the alleged RICO violation." Id.

"Although 18 U.S.C. § 1962(a)-(c) have common elements that are often analyzed together, each subsection also targets distinct acts." Gil Ramirez Group, LLC v. Houston Independent School Dist., No. 4:10-cv-4872, 2012 WL 5633880, at *12 (S.D. Nov. 15, 2012).  Under § 1962(a), "a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise"; § 1962(b) makes it unlawful for a person to "acquire or maintain an interest in an enterprise through a pattern of racketeering"; and § 1962(c) makes it "unlawful for any person

32

employed by or associated with any enterprise ... to conduct or
participate, directly or indirectly, in the conduct of such
enterprise's affairs through a pattern of racketeering activity,"
"Under all those subsections, to state a RICO claim, there must
be: '(1) a person who engages in (2) a pattern of racketeering
activity (3) connected to the acquisition, establishment, conduct,
or control of an enterprise.'" St. Paul Mercury Ins. Co. v.
Williamson, 224 F.3d 425, 439 (5th Cir. 2000) (quoting Delta Truck
& Tractor, Inc. v. J.I. Case Co., 855 F.2d 241, 242 (5th Cir.
1988)).  An "enterprise" is defined as "any individual,
partnership, corporation, association, or other legal entity, and
any union or group of individuals associated in fact although not
a legal entity." 18 U.S.C. § 1961(4).  "Racketeering activity" is
defined as certain criminally indictable acts.  Id. § 1961(1).

     In the case at bar, plaintiffs do not identify which of the
substantive RICO provision was allegedly violated.  However, their
ostensible RICO claim appears to be grounded on the following
allegations: (1) Defendants falsely represented that they would
not foreclose if plaintiffs submitted an application to bring
their mortgage payments current and yet after plaintiffs had done
so and had submitted two of three payments needed to bring their
loan current, defendants issued a default to foreclosure anyway,
without notice; and (2) Defendants knew that plaintiffs' mortgage
loan would be securitized and yet withheld this information from

33

plaintiffs and further, in their push to increase revenue and profits by expanding their share of the residential mortgage-backed securitization market, defendants included untrue statements of material facts and omissions of fact in the Registration Statements for the securities.

Defendants argue that plaintiffs have failed to state a claim under RICO as they have not alleged either injury or causation and hence have not identified a basis for standing and as they have not alleged the requisite predicate acts and have not alleged fraud with specificity. Defendants further point out that plaintiffs cannot proceed with a RICO claim as they have failed to comply with local rules of this court in order to state a RICO claim. Defendants are correct on all these points.

It is manifest that, among other shortcomings of their claim, plaintiffs have not identified how they were injured as a proximate result of defendants' alleged fraudulent scheme relative to the securitization of their mortgage. To satisfy RICO's standing requirement, plaintiffs must allege facts demonstrating that they suffered a concrete financial loss as a proximate result of the alleged RICO violation. See Patterson v. Mobil Oil Corp., 335 F.3d 476, 492 (5th Cir. 2003) ("A plaintiff may not sue under RICO unless he can show concrete financial loss."). Plaintiffs have not alleged that any damages arose from anything other than their default on their loan, and they have not alleged that they

suffered a concrete financial loss beyond what they already owed on their loan.  Thus, their RICO claim premised on fraud in connection with the securitization of their mortgage loan fails.

Plaintiffs' allegation that defendants misrepresented that they would not foreclose if plaintiffs made payments to bring their loan current plainly does not state a claim under RICO. There is no allegation, express or implied, that this was part of any "pattern" of "racketeering activity."  Furthermore, as with their allegations relating to the securitization of their mortgage, plaintiffs have not alleged that they suffered actual concrete financial loss as a result of their alleged reliance on this alleged misrepresentation.  Accordingly, plaintiffs' putative RICO claim will be dismissed.[9]

Negligent Misrepresentation/Fraudulent Misrepresentation

Plaintiffs have undertaken to plead causes of action for negligent and fraudulent misrepresentation based upon alleged misrepresentations made in "Registration Statements for those

---

[9]   As a final potential federal claim, plaintiffs' complaint recites that defendants violated the Patriot Act in various ways but it does not appear that they have attempted to assert a cause of action for the alleged violations.  In fact, they recite as much in their complaint; and in their response to the motion, plaintiffs do not mention this claim.  Even if they intended to assert such claim, it would be dismissed since there is no private right of action under the USA Patriot Act.  See Ray v. First Nat. Bank of Omaha, 413 Fed. App'x 427, 430 (3d Cir. 2011) (holding that "the Patriot Act does not provide for a private right of action for its enforcement").

Securitizations" and in "Prospectus Supplements."  In addition,

they purport to assert a claim "for aiding and abetting fraud

against all Defendants ... with respect to the Securitizations

sponsored by J.P. Morgan Acquisition."

     To state a claim for fraud, plaintiffs must allege each of

the following elements:

     (1) a representation (2) that is false (3) and material
     (4) that the speaker knew it was false or was ignorant
     of the truth (5) combined with the speaker's intent that
     the listener act on the representation in a manner
     reasonably contemplated (6) combined with the listener's
     ignorance of the statement's falsity (7) and the
     listener's reliance on the statement as true (8) that
     the listener had a right to rely on the statement, and
     (9) the listener's proximate injury as a consequence.

Smith v. Fortis Ins., No. Civ. A. 104CV73WJGJMR, 2005 WL 1657049,

at * 6 (S.D. Miss. Jul. 8, 2005).  To prevail on a claim for

negligent misrepresentation, plaintiffs must allege and prove each

of the following elements:

     (1) a misrepresentation or omission of a fact; (2) that
     the representation or omission is material or
     significant; (3) that the person/entity charged with the
     negligence failed to exercise that degree of diligence
     and expertise the public is entitled to expect of such
     persons/entities; (4) that the plaintiff reasonably
     relied upon the misrepresentation or omission; and (5)
     that the plaintiff suffered damages as a direct and
     proximate result of such reasonable reliance.

Hazlehurst Lumber Co. v. Miss. Forestry Comm'n, 983 So. 2d 309,

313 (Miss. 2008).  As defendants point out, given that plaintiffs

herein were borrowers, not investors, any alleged

misrepresentations by defendants in connection with the sale of

36

securities would not have even been made to plaintiffs.
Plaintiffs do not allege otherwise, nor could they reasonably do
so.  Moreover, plaintiffs do not allege how they, as opposed to
investors, relied upon any such misrepresentations.[10]  Thus,
plaintiffs have failed to state viable claims for fraudulent or
negligent misrepresentation relative to sale of securities.  It
follows that they have failed to state any claim for "aiding and
abetting" any such fraud.  See Bowden v. Young, 120 So. 3d 971,
981 (Miss. 2013) (holding that claim for aiding and abetting

---

[10]     Plaintiffs do recite in the complaint that defendants
"made the misleading statements for the purpose of inducing the
plaintiffs to purchase their home and property," and that
plaintiffs "relied on defendants' misrepresentations" in
purchasing their home and property.  However, plaintiffs describe
their claims as being for fraud and negligent misrepresentation
relative to the securitizations, and the misrepresentations on
which they claim to have relied are misrepresentations in the
Registration Statements and Prospectuses "as to the accuracy of
the represented credit ratings (of borrowers), compliance (by
Chase) with underwriting guidelines for the mortgage loans, and
the accuracy of the owner-occupancy statistics and the loan-to-
value ratios applicable to the Securitizations, as disclosed in
the term sheets and Prospectus Supplements."  Plaintiffs cannot
have relied on these alleged representations, which were not made
to them, but rather to prospective investors.
     Obviously, all plaintiffs have done is take the allegations
in the Federal Housing Finance Agency v. JP Morgan Chase complaint
and tried to make them apply to plaintiffs by changing the
phrasing so that rather than refer to the investors' purchase of
securities, the complaint now refers to plaintiffs' purchase of
their home and property.  But the alleged misrepresentations
remain the same; and as plaintiffs purchased their home and
property prior to the securitization and sale of their mortgage,
and further as plaintiffs were not investors, plaintiffs could not
have relied on misrepresentations which they identify in the
complaint as the basis for their fraud and negligent
misrepresentation claims.

should be dismissed for failure to state a claim for which relief can be granted, because the underlying substantive claims upon which such claim was based were themselves incapable of achieving relief).

Plaintiffs also refer in their complaint to defendants' "fraudulent scheme of inducing Plaintiffs to accept mortgages for which they were not qualified based on inflated property valuations." From what the court can reasonably gather from the complaint, the substance of plaintiffs' allegations in this regard is that defendants, in order to support their expansion into the mortgage-backed securities market, needed to generate mortgages that they could bundle and sell as collateral for securities; and in order to do this, they disregarded their normal underwriting standards and generated fraudulently-inflated appraisals, resulting in the approval of prospective borrowers like plaintiffs for loans which defendants knew these borrowers could not afford and in amounts which defendants knew exceeded the true fair market value of the properties. According to the complaint, defendants knew that plaintiffs did not qualify for the loan for which they were approved, and defendants further knew that the appraisal was inflated; and yet defendants led plaintiffs to believe that they could afford the loan and that the property value was sufficient to fully collateralize the loan. Plaintiffs suggest that they relied to their detriment on defendants' approval of the loan and

that as a result, they have defaulted on the loan and are "upside

down" on the loan, owing more than the home is worth.

Assuming that plaintiffs have attempted to assert a claim for

fraud based on these allegations, such claim is plainly barred by

the statute of limitations.  As defendants note in their motion,

any fraud claim relating to the origination of plaintiffs' loan is

time-barred by the three-year statute of limitations on claims for

fraud.  See CitiFinancial Mortgage Co. v. Washington, 967 So. 2d

16, 17 (Miss. 2007) (ruling that fraudulent misrepresentation

claim is subject to three-year statute of limitations in Miss.

Code Ann. § 15-1-49).

Wrongful Foreclosure

Defendants seek dismissal of plaintiffs' claim for "wrongful

foreclosure."  It is not clear to the court that plaintiffs have

asserted, or attempted to assert a claim for wrongful foreclosure.

They allege that they have been wrongfully threatened with

foreclosure, but, as defendants point out, plaintiffs do not

allege that a foreclosure ever took place or that they were

evicted from the property.  Defendants contend that since an

actual foreclosure is the *sine qua non* of any claim for wrongful

foreclosure, plaintiffs have not stated a viable claim for

wrongful foreclosure.  See McKinley v. Lamar Bank, 919 So. 2d 918,

930 (Miss. 2005) ("As correctly noted by the trial court, '[t]here

*was no wrongful foreclosure because there was never a foreclosure*

39

*at all.*' This important fact cannot be over-emphasized.")
(emphasis in original); <u>Temple-Inland Mortgage Corp. v. Jones</u>, 749
So. 2d 1161, 1167 (Miss. Ct. App. 1999) (finding no wrongful
foreclosure where "there was no actual foreclosure on the
[plaintiffs'] property.").  For this reason, to the extent that
plaintiffs may have attempted to state a claim for wrongful
foreclosure, that claim is due to be dismissed.

<u>Cancellation of Instruments</u>

Plaintiffs demand cancellation of various instruments which
they believe were "prepared and recorded (by defendants) without a
factual or legal basis for doing so."  They state, without
elaboration or explanation, that

> Chase and its affiliates "acted willfully and with a
> conscious disregard for Plaintiff's rights and with a
> specific intent to defraud and injure Plaintiff, by
> causing the SOT (Substitution of Trust), the NOD (Notice
> of Default), the Assignment of the DOT (Deed of Trust),
> the first NOTS (Notice of Trustee Sale), the Second NOTS
> and the TDUS (Trustee Deed Upon Sale) instruments to be
> prepared and recorded without a factual or legal basis
> for doing so.

Plaintiffs have themselves offered no factual or legal basis for
cancellation of any instrument and therefore, their demand for
cancellation of instruments will be dismissed.

<u>Promissory Estoppel</u>

In their complaint, plaintiffs allege that defendants
promised them, through oral and written representations, that the
subject property would not be foreclosed if plaintiffs completed

40

an application for a loan modification and made monthly payments in an amount certain to defendants.  Plaintiffs allege that they justifiably relied on defendants' promise by completing a loan modification application and making payments rather than pursuing alternate measures to avoid the foreclosure, including, but not limited to, filing a Chapter 11 bankruptcy or exploring the possibility of refinancing or marketing and selling the property. Based on these allegations, plaintiffs assert that defendants were "estopped from taking any action that was contrary to the written and oral promises made by it to Plaintiff."

     "[T]he elements of promissory estoppel are: (1) the making of a promise, even though without consideration, (2) the intention that the promise be relied upon and in fact is relied upon, and (3) a refusal to enforce it would virtually sanction the perpetuation of fraud or would result in other injustice." Thompson v. First American Nat. Bank, 19 So. 3d 784, 788 (Miss. Ct. App. 2009) (citation omitted).  In Thompson, the court held that a bank teller's alleged promise to the mortgagor that the bank would not foreclose if the mortgagor made two payments on his loan rather than bringing his loan current did not support a claim for promissory estoppel as it would not "sanction an injustice or perpetrate a fraud for a bank to collect what is rightfully owed to it." Id. at 789. See also Stewart v. GMAC Mortg., LLC, Civil Action No. 2:10-cv-00149-DCB-JMR, 2011 WL 1296887, at *6 (S.D.

41

Miss. Mar. 31, 2011) (holding that promissory estoppel was not appropriate to enforce lender's alleged promise that it would not foreclose on home "because a refusal to enforce that promise here would not result in injustice" as the borrower "was delinquent in his mortgage payments and foreclosure was appropriate under the Deed of Trust"). On this basis, plaintiffs' claim for promissory estoppel fails as a matter of law.

### Plaintiffs' Request to Amend

In their response, plaintiffs urge the court to deny defendants' motion but request that the court give them an opportunity to amend in the event the court should find that any of their claims are insufficiently pled. Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend should be freely given "when justice so requires." Moreover, the Fifth Circuit has held that "[g]enerally a district court errs in dismissing a *pro se* complaint for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend." Bazrowx v. Scott, 136 F.3d 1053, 1054 (5th Cir. 1998). However, "[i]t is within the district court's discretion to deny a motion to amend if it is futile." Stripling v. Jordan Prod. Co., LLC, 234 F.3d 863, 872-73 (5th Cir. 2000). While plaintiffs ask to be allowed to amend, they have not suggested how they might state a claim where none has been stated. That is, as defendants note, they have failed to articulate any factual basis to support any other claims

that would be more plausible than the ones they have already
attempted to assert.  Therefore, the court concludes that any
amendment would be futile and for this reason, the request to
amend is denied.

Non-Chase Defendants

Although plaintiffs have named as defendants Nationwide
Trustee Services, Inc., Prommis Solution, LLC and J.M. Adjustment
Services, the court, having examined the amended complaint in its
entirety, finds that plaintiffs have made no substantive
allegations against these defendants.  As to Nationwide Trustee
Services and Prommis Solution, plaintiffs allege only that Chase
has regularly used Nationwide and Prommis to foreclose trust deeds
on Mississippi realty and realty in other states.  Plaintiffs do
not allege that either defendant conducted a foreclosure of their
property.  The sole reference in the complaint to J.M. Adjustment
Services states that this defendant "served as an Assistant
Facilitator for JP Morgan Chase in providing Unauthorized
Communications and Trespass on Plaintiff's Private Property."
This plainly does not state a factual or legal basis for relief.

Conclusion

Based on all of the foregoing, it is ordered that defendants'
motion to dismiss is granted.

A separate judgment will be entered in accordance with Rule
58 of the Federal Rules of Civil Procedure.

SO ORDERED this 11th day of April, 2014.


                              /s/Tom S. Lee
                              UNITED STATES DISTRICT JUDGE